IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CITIZENS FOR COMMUNITY ACTION, an Illinois not for profit corporation, WAYNE STRNAD, and BRUCE RANDAZZO<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF CHICAGO, a municipal corporation, ALFRED SANCHEZ, CATHARINE MULLEN HENNESSY, TOMMY JOHNSON, BARRY BERMAN AND GERALD BROWN,<br><br>Defendants. | No. 04 C 5395 |

## MEMORANDUM OPINION AND ORDER

Bruce Randazzo ("Randazzo"), Wayne Strnad ("Strnad"), and Citizens for Community Action ("CCA"), an Illinois not for profit corporation, filed a seven count complaint against the City of Chicago ("the City"), Alfred Sanchez ("Sanchez"), the former Commissioner of the City's Department of Streets and Sanitation, Catharine M. Hennessy ("Hennessy"), Tommy Johnson ("Johnson"), Barry Berman ("Berman"), and Gerald Brown ("Brown"). On April 29, 2005, I granted a motion to dismiss claims brought by plaintiffs CCA and Strnad. On October 6, 2005, I granted an additional unopposed motion to dismiss, resulting in all claims against defendants Sanchez, Hennessy, Johnson, Berman, and Brown being

1

dismissed. Randazzo is the sole remaining plaintiff and the City is the sole remaining defendant in this case. Randazzo's claims are: 1) a claim for violation of his due process right to freedom of association under the Fourteenth Amendment; 2) a claim for violation of his First Amendment right to free speech; 3) a First Amendment challenge to the City's Personnel Rule XVIII, Section 1, Subsection 12; and 4) an equal protection claim.[1] The City seeks summary judgment on all claims.

Randazzo began working for the Department of Streets and Sanitation ("DSS") on December 16, 1994 and worked there until June 16, 2003, when he was transferred to the City's Water Department. During his time at DSS, Randazzo worked as a Motor Truck Driver ("MTD"). CCA is a not for profit corporation headed by Strnad which conducts research, publishes written materials, and otherwise advocates for change on a variety of social issues, including reform of the City government. As part of its operations, CCA puts out a regular newsletter and maintains a website. Randazzo characterizes himself as "an active participant" in CCA, but does not consider himself a "member" of the organization. According to Randazzo's testimony, he first became acquainted with Strnad

---

[1]Randazzo now proceeds *pro se*, but was represented by counsel up until January 27, 2006, when I granted counsel's motion to withdraw. Thus, Randazzo was represented by counsel throughout the discovery process, which closed on December 30, 2005.

sometime between 1999 and 2001.[2]  During his time at DSS, Randazzo claims he was a frequent whistleblower on numerous issues. Randazzo would whistleblow through union grievances and by providing information to Strnad and CCA.

Randazzo had a long history of disciplinary problems during his employment at DSS.  On July 6, 1995, he received a written reprimand for "excessive absenteeism" from MTD Foreman Louis Reitmeier.[3]  On April 16, 1996, Randazzo received a written reprimand from MTD Foreman Ted Zook, which was later reduced to an oral reprimand, for tailgating a motorist and giving the motorist a hand gesture.[4]  On May 2, 1997, Randazzo received a written reprimand from MTD Foreman Phil Peorie, which was later reduced to an oral reprimand, for "failing to comply in carrying out any [sic] acts in the scope of employment with laws or departmental rules governing health, safety and sanitary conditions" and "violating

---

[2]In his affidavit, Randazzo stated that he met Strnad in November, 2001.  In his deposition, however, Randazzo testified that he met Strnad in 1999 or 2000, but was unsure of the exact time.

[3]It is undisputed that Randazzo received this reprimand, but he contests the underlying events leading to the reprimand.

[4]It is also undisputed that Randazzo received this reprimand, but he contests the underlying events leading to the reprimand. Randazzo states the "hand gesture referred to was a wave (Italian gesture) and not a finger gesture as the City might like one to believe."

3

any departmental regulations and rules or procedures."[5] On June 24, 1997, Randazzo received a 10-day suspension notice from MTD Foreman Barry Berman for "disobeying direct and posted orders (truck maintenance) . . . [and] [i]nefficient operation of City motor vehicle."[6] On December 15, 1998, Randazzo was terminated for blowing up a portable toilet with a firework. After a hearing on March 29, 1999, Randazzo's termination was reduced to at 30-day suspension for "conduct unbecoming a public employee."[7] and he returned to work. On November 30, 1999, Randazzo received a one day suspension for absenteeism from MTD Foreman Berman.[8] On June 27, 2000, Randazzo received a written reprimand from Assistant Commissioner Hennessy for "[d]iscourteous treatment in the form of negligent/willful conduct towards a co-worker wherein on, or about June 1, 2000 [Randazzo] slammed the door on a trailer in an attempt

---

[5]It is undisputed that Randazzo received this reprimand, but he contests the underlying events leading to the reprimand.

[6]It is undisputed that Randazzo received this suspension, but he contests the underlying events leading to the suspension and whether he accepted the suspension.

[7]It is undisputed that Randazzo received this suspension, but he contests the underlying events leading to the suspension. According to Randazzo, "I did not blow up a port-a-pottie as the City still says this day. . . . I lit a smoke cracker causing no damage."

[8]It is undisputed that Randazzo received this suspension, but he contests the underlying events leading to the suspension.

4

to hit a co-worker with the door."[9] On July 11, 2000, Randazzo received a 15-day suspension, which was later reduced to a 3-day suspension, from supervisor Walter Thompson for failing to follow instructions.[10] On January 25, 2002, Randazzo received a 10-day suspension, which was later reduced to a 3-day suspension, from MTD Foreman Brown for "[b]eing disrespectful to [his] Foreman, when instructing [him] on how to drive safely . . . ."[11] On February 12, 2002, Randazzo received a 29-day suspension from General Superintendent Frank Respondi for "falsifying work sheet and not completing work sheet. Being at a location when not authorized to be there. Failure to perform duties that were required."[12] On March 7, 2002, Randazzo received a written reprimand for wearing a confederate flag bandanna at work. At the time, he was instructed not to wear the bandanna at work again.[13]

---

[9]It is undisputed that Randazzo received this reprimand, but he contests the underlying events leading to the reprimand.

[10]It is undisputed that Randazzo received this reprimand, although he contests some of the underlying events leading to the reprimand.

[11]It is undisputed that Randazzo received this suspension although he contests the underlying events leading to the suspension.

[12]It is undisputed that Randazzo received this suspension, but he contests the underlying events leading to the suspension. The parties also dispute whether this suspension was ultimately overturned after a hearing.

[13]It is undisputed that Randazzo received this reprimand, but he contests the underlying events leading to the reprimand. Randazzo also insists that it was not inappropriate for him to be

5

On August 15, 2002, Randazzo received a 29-day suspension from Assistant Commissioner Hennessy. Randazzo was disciplined for distributing a newsletter over departmental fax machines which contained an ad for his candidacy for Secretary-Treasurer of Teamsters Local 726 and also contained an article titled "Randazzo Denounces Gag Directive." Hennessy's stated reasons for the discipline were that Randazzo's article incited other DSS employees to throw a departmental directive regarding media contact into the garbage and that Randazzo had improperly used DSS equipment to promote his personal candidacy. Randazzo claims that at the time he received the suspension, Hennessy threatened that "[y]ou better stay away from Wayne Strnad or you are going to get fired." According to Randazzo's complaint, this suspension was later reduced to a "warning."

On November 6, 2002, Randazzo received a 20-day suspension from MTD Foreman Berman for not turning on the truck radio.[14] On November 21, 2002, Randazzo received a 25-day suspension from MTD Foreman Berman for failing to turn in "an ID swipe" when instructed to do so.[15] The November 6 and November 21 suspensions were later

wearing a confederate flag bandanna.

[14]It is undisputed that Randazzo received this suspension notice, but Randazzo contests the underlying events leading to the suspension notice.

[15]It is undisputed that Randazzo received this suspension notice, but Randazzo contests the underlying events leading to the suspension notice.

reduced to a single 10-day suspension after a hearing. On June 16, 2003, Randazzo's tenure at DSS ended when he was transferred to the Water Department pursuant to an agreement settling a charge he brought against DSS with the Illinois Department of Human Rights concerning a denied transfer.

I.

Summary judgment is appropriate where the record shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Lexington Ins. Co. v. Rugg & Knopp*, 165 F.3d 1087, 1090 (7th Cir. 1999); FED. R. CIV. P. 56(c). I must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "The nonmoving party must offer something more than a 'scintilla' of evidence to overcome summary judgment and must do more than simply 'show that there is some metaphysical doubt as to the material facts.'" *Roger Whitmore's Auto. Servs. v. Lake County, Ill.*, 424 F.3d 659, 667 (7th Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

II.

The City has moved to strike Randazzo's response to its statement of material facts and his statement of additional facts for failure to comply with Local Rule 56.1. The City argues that

7

Randazzo's assertions of fact generally lack citation to the record, cite to parts of the record that do not support the factual assertion, or cite to parts of the record containing inadmissible evidence, (e.g., hearsay and speculation). Additionally, the City argues that Randazzo's assertions of fact are argumentative and in large part contain facts that are irrelevant to the resolution of Randazzo's claims.

I will not strike Randazzo's statement of material facts in its entirety, but I will not consider those statements that are in violation of the Local Rules. Even though Randazzo proceeds *pro se*, he is still obligated to follow Local Rule 56.1(b). Numerous paragraphs found in Randazzo's statements do not cite to the record at all, or cite to parts of the record that do not support his factual assertions. For example, Randazzo asserts that "[f]urther proof of unequal treatment occurred in the case of Barney Lonzo . . . [he] was fired, based upon trumped up charges," but makes no citation to the record. As a result, the court cannot determine what evidence, if any, supports this assertion. Therefore, the court will not consider such miscited paragraphs in its decision. Also, numerous paragraphs that do cite to the record, cite to inadmissible evidence (e.g., hearsay or speculation). Evidence presented in opposition to a motion for summary judgment must be admissible in content, though it need not be in an admissible form. *Payne v. Pauley*, 337 F.3d 767, 775 n.3 (7th Cir. 2003). Those

8

factual assertions which are based upon inadmissible evidence will also not be considered in the court's decision.

Additionally, the City has requested that I strike Randazzo's accompanying affidavit because it is conclusory, relies upon hearsay and conjecture, and fails to demonstrate that Randazzo has personal knowledge of the facts to which he testifies. "On a motion for summary judgment, a court must not consider those parts of an affidavit that are insufficient under [FED. R. CIV. P.] 56(e)." *Adusumilli v. City of Chicago*, 164 F.3d 353, 359 (7th Cir. 1998). I will not strike Randazzo's affidavit in its entirety, as the City requests, but I will not consider those parts of his affidavit that do not comply with Rule 56(e) or are not material to the resolution of his claims.

## III.

The statute of limitations for claims brought under § 1983 is two years. *Ashafa v. City of Chicago*, 146 F.3d 459, 461 (7th Cir. 1998). As a result, all claims for conduct occurring before August 15, 2002 are barred by the statute of limitations.[16] Thus, I will

---

[16]Randazzo actually filed his complaint on August 16, 2004. Because August 15, 2004 was a Sunday, however, I held that he could bring claims for conduct occurring on or after August 15, 2002. *See Citizens for Community Action v. City of Chicago*, No. 31 04 Civ. 5395, at 3-4 (April 29, 2005). Randazzo argues that the City's record evidence, which includes evidence of discipline he received prior to August 15, 2002, violates the statute of limitations. The statute of limitations is a defense that bars a plaintiffs' claims when they are untimely; it does not limit the evidence that either party may introduce which is relevant to the resolution of timely-filed claims.

9

only consider Randazzo's suspension on August, 15, 2002 and actions occurring thereafter.[17]

IV.

Randazzo's first claim (Count III) is for deprivation "of his right to freely associate with CCA, Strnad, and other city employees . . . in violation of . . . the Fourteenth Amendment right to due process of law." Randazzo's second claim (Count IV) is for deprivation of "his right to free exercise of speech in violation of . . . the First Amendment." There are two types of association protected by the Constitution of the United States: 1) freedom of expressive association; and 2) freedom of intimate association. *Montgomery v. Stefaniak,* 410 F.3d 933, 937 (7th Cir. 2005). "[F]reedom of expressive association[] arises from the First Amendment and ensures the right to associate for the purpose of engaging in activities protected by the First Amendment." *Id.* Second, "freedom of intimate association, protects the right 'to enter into and maintain certain intimate human relationships'" and is protected as an element of personal liberty by the Due Process clauses. *Id.* (quoting *Roberts v. United States Jaycees,* 468 U.S. 609, 617 (1984)).

---

[17]Examples of acts barred by the statute of limitations include: a denial of a promotion to the position of foreman in 2001; a denial of his motion to transfer to a more desirable route in 2001; and his reprimand for wearing the confederate flag bandanna in March, 2002.

10

Associations that are entitled to protection under the due process clause are close, family relationships. *See Roberts*, 468 U.S. at 619 ("The personal affiliations that exemplify these considerations, and that therefore suggest some relevant limitations on the relationships that might be entitled to this sort of constitutional protection, are those that attend the creation and sustenance of a family . . . ."). "As a general matter, only relationships with these sorts of qualities are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element of personal liberty." *Id.* at 620. Moreover, where "freedom of association involves [the] right to associate conspicuously with others for the purpose of protesting allegedly discriminatory practices," that association is not protected as an intimate association. *Marshall v. Allen*, 984 F.2d 787, 799 (7th Cir. 1993). The record indicates that Randazzo's association with Strnad and CCA was for the purpose of protesting city corruption; it was not an intimate family relationship. According to Randazzo, he would meet with Strnad "maybe twice a week . . . to talk about wrongdoings that occur in the City of Chicago." Therefore, Randazzo's association with CCA and Strnad is not entitled to protection under the Due Process clause, and this claim fails.

Randazzo's associations with CCA and Strnad are, however, protected by the First Amendment. *Id.* Therefore, I will consider Randazzo's second claim for retaliation in violation of his First Amendment rights to encompass both a freedom of speech and a freedom of association claim. In order to establish a claim for retaliation under the First Amendment, Randazzo must establish that: his speech (or association) was protected and his speech (or association) was a substantial or motivating factor in the retaliatory action. *Spiegla v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004); *Klug v. Chicago Sch. Reform Bd. of Trs.*, 197 F.3d 853, 857 (7th Cir. 1999).

The City first argues that Randazzo's speech was not protected. In determining whether Randazzo's speech is protected, a court must consider whether the speech touches on a matter of public concern and, if so, balance the plaintiff's interest in that speech with the government's employer interest in efficiency. *Spiegla*, 371 F.3d at 935. In order to determine if Randazzo spoke on a matter of public concern, the court looks to the content, form, and context of his speech. *Id.* "Speech by a government employee relating to ordinary matters of internal operation and lacking connection to 'any matter of political, social, or other concern to the community' is not entitled to First Amendment protection." *Id.* at 936 (quoting *Connick v. Myers*, 461 U.S. 138, 146 (U.S. 1983)). Moreover, "the public concern element is lacking

12

as a matter of law if speech 'concerns a subject of public interest but the expression addresses only the personal effect upon the employee . . . .'" *Cliff v. Bd. of Sch. Comm'rs*, 42 F.3d 403, 410 (7th Cir. 1994) (quoting *Marshall v. Porter County Plan Comm'n*, 32 F.3d 1215, 1219 (7th Cir. 1994)).

Randazzo points to various whistleblowing he did while at DSS and argues that this speech touched on matters of public concern. Randazzo states, "I was actively involved in matters of public concern such as issues centering on the training (Exhibit 8), environment (Exhibit 9), labor rights (Exhibit 10), health and safety issues (Exhibit 11), etc." With two notable exceptions, the evidence Randazzo cites does not, however, constitute speech that touched upon matters of public concern. For example, as evidence of "environmental" whistleblowing, Randazzo points the court to union grievances that he filed complaining that the carpet in a DSS facility had not been cleaned in five weeks and was causing him to have asthmatic reactions; that there was no sink for employees to use to wash their hands after using a portable bathroom at a DSS facility; and that one of his supervisors was harassing him for wearing a vest at all times even though his vest was too large for him. Randazzo's speech touched upon internal problems at DSS and his speech was undertaken for personal reasons. The fact that these concerns were expressed in union grievances does not transform them into matters of public concern. *Berry v. Illinois*

13

*Dep't of Human Servs.*, 2003 U.S. Dist. LEXIS 19286, at *36 (N.D. Ill. October 29, 2003) ("Pursuing a matter of individual concern through a union grievance process does not make it protected First Amendment conduct."). Randazzo also repeatedly makes generalized allegations asserting that he was active in exposing city corruption and wrongdoings, but has failed to point the court to specific admissible evidence of speech that can be attributed to him on these matters.[18] These generalized allegations are insufficient to raise a material issue of fact. *See e.g., Brooks v. Univ. of Wis. Bd. of Regents*, 406 F.3d 476, 479-80 (7th Cir. 2005).

Two instances, however, require further analysis. First, Randazzo has testified that he contacted the EPA regarding waste being dumped in a City parking lot. Randazzo, however, has produced no actual evidence that his report to the EPA was a motivating factor in any of the adverse actions taken against him.[19]

---

[18]Randazzo repeatedly refers the court to unauthenticated, anonymously written articles that discuss city corruption, some of which appear to come from CCA newsletters. Randazzo insisted in his deposition that he was not a member of CCA, he was not its Treasurer, and only was an "active participant." Thus, there is no basis to impute any speech in these articles (or any other articles contained in the exhibits that are not directly attributed to Randazzo) to Randazzo.

[19]In his deposition, Randazzo gave only a general estimate that he made this report to the EPA some time between 2000 and 2002. This lack of ability to pinpoint a date only makes it more difficult for Randazzo to establish a causal connection between his speech and any adverse action.

14

He merely states in conclusory terms that he was retaliated against for this act of expression (as one of many) without tying the speech to any specific act of retaliation. *See Trnka v. Local Union No. 688, United Auto., Aerospace & Agric. Implement Workers*, 30 F.3d 60, 63 (7th Cir. 1994) (holding that bare assertions that speech and adverse actions are related is insufficient to survive summary judgment). Therefore, his claims based upon his report to the EPA fail.

Second, the events surrounding Randazzo's August 15, 2002 discipline and his association with Strnad and CCA in general must be addressed. The circumstances are as follows: on July 24, 2002, DSS Deputy Commissioner Levar issued a directive instructing DSS employees that "all interaction with the media should be directed to the Department's Public Information Officers" and that "[i]f an employee is approached by someone from the media, he or she should direct that individual to his or her supervisor." Randazzo viewed this article as a direct attempt by DSS to limit his (and other DSS employees') contact with Strnad, who was a vocal critic of DSS and the City in general. Randazzo's sentiments are conveyed in the article titled "Randazzo Denounces Gag Directive"[20] which states:

---

[20]The article is written in the first-person and contains a photograph of Randazzo. In his deposition, Randazzo denied writing the article. It appears from his testimony, however, that the article did accurately represent his sentiments. Regardless, it is undisputed that the Hennessy perceived this article as being written by Randazzo.

> I wonder why they just didn't come out and say Wayne's
> [i.e., Strnad's] name in the directive? This so called
> directive is paramount to a gag order which should be
> thrown in the garbage can and then picked up by us
> teamsters in our poor [sic] conditioned sweat boxes,
> called garbage trucks.

The article was part of a CCA newsletter that was transmitted over

an unspecified number of DSS fax machines on August, 6, 2002. The

newsletter also contained an advertisement for Randazzo's candidacy

for Secretary-Treasurer of Teamsters Local 726.

Thereafter, Randazzo received a 29-day suspension from

Hennessy for using DSS resources (the fax machines) to promote his

union candidacy and for inciting his co-workers to throw Levar's

directive in the garbage. Hennessy's suspension notice stated:

> On or about August 6, 2002, you were involved in the
> distribution of a newsletter and/or authored an article
> [sic] in such [sic] letter that was widely distributed to
> your coworkers in which you urged and/or incited your
> coworkers not to follow, to ignore, and/or throw in the
> garbage a written directive from the Deputy of
> Sanitation. In addition, you used the office, work site,
> work locations and work materials and supplies to
> distribute such newsletter and to solicit support for
> your run for a Union office.

Randazzo testified that upon giving him this suspension, Hennessy

threatened "[y]ou better stay away from Wayne Strnad or you are

going to get fired."

The article spoke out against Levar's directive, which was

interpreted by Randazzo to prevent employees from speaking to and

associating with the media under all circumstances and concerning

16

any subject.[21] Thus, this directive, as interpreted by Randazzo, sought to achieve far more than just streamlining media contact at DSS. In Randazzo's opinion, the directive would, for example, prevent him from helping to expose city corruption through contact with Strnad and CCA. Randazzo therefore believes he was punished for speaking out on a matter of public concern.

The City does not argue that speaking out against a "gag directive" (if Levar's directive could be considered that) is not a matter of public concern. Rather, the City argues that Randazzo was not in fact disciplined for opposing Levar's directive, but for two different reasons: 1) the manner in which he expressed his criticism about Levar's directive, which the City argues incited other employees to dispose of the directive; and 2) his improper use of DSS resources to promote his candidacy. While Randazzo has the right to speak out on matters of public concern, his speech is not protected when it is unnecessarily disruptive and incites insubordination. *See generally, Berg v. Hunter*, 854 F.2d 238, 243-44 (7th Cir. 1988). Moreover, it is Randazzo's burden to "establish[] that the [City] would not have taken the challenged actions 'but for' the constitutionally protected conduct," which he has not done. *Thomsen v. Romeis*, 198 F.3d 1022, 1027 (7th Cir.

---

[21]The City does not comment on the substance of Levar's directive either to explain its origin or to explain how the directive was implemented. There is no testimony from Levar in the record.

`2000). Randazzo argues that his speech was a motivating factor in his discipline by arguing that he received his suspension shortly after the article was published. This argument, however, ignores the fact that there were other, justifiable reasons, stated in the suspension notice, for his discipline. Additionally, temporal proximity is weak evidence of causation, particularly in cases where an employee has a long of history of disciplinary action against him. *See Cygan v. Wis. Dep't of Corr.*, 388 F.3d 1092, 1102 (7th Cir. 2004).

Furthermore, the fact that Randazzo denies that he authored the article or was involved in its transmission over DSS fax machines does not change the outcome. In order to demonstrate pretext, Randazzo must show that the City's stated reasons were a lie or had no basis in fact. *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000). Randazzo has not made this showing. Nothing in the admissible record suggests that the City did not actually believe Randazzo authored the article. In fact, Hennessy's conclusion was patently reasonable given that the article was titled "Randazzo Denounces Gag Directive," was written in the first-person, and contained Randazzo's photograph.

Randazzo has also failed to show any causal link between this speech and any other subsequent action taken against him at DSS (e.g., his subsequent suspensions). Again, he relies solely on speculation and conclusory allegations that any of these subsequent

18

action was retaliatory; this is insufficient to survive a motion for summary judgment.

Randazzo argues that his general association with Strnad and CCA played a role in his suspension. Randazzo testified that Hennessy stated to him on August 15, 2002 that "[y]ou better stay away from Wayne Strnad or you are going to get fired." Randazzo interpreted this remark as a threat that if he continued to associate with Strnad, he would be terminated.[22] Hennessy's statement has First Amendment implications because a retaliation claim under the First Amendment only requires conduct that is sufficiently adverse to deter the exercise of an employee's First Amendment rights. *Berry*, 2003 U.S. Dist. LEXIS 19286, at *34 ("[T]he adverse action inflicted must be 'likely to chill a person of ordinary firmness from continuing to engage in that activity.'") (quoting *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998)). A threat to fire Randazzo for his association with Strnad and CCA would be sufficient to deter Randazzo from engaging in protected activity. *See e.g., Id.* at *42-43 (threat to transfer enough to deter speech). Additionally, Randazzo testified at his deposition that he has in fact reduced his contact with Strnad due to a fear of being discharged. Furthermore, Randazzo testified that he was

---

[22]Randazzo also testified that MTD Foreman Brown made a similar remark to him.

19

transferred by Hennessy shortly thereafter and then received
increasingly harsh suspensions.

Even if it a fact-finder could conclude that Hennessy's
actions (or the actions of any other DSS employee) did violate
Randazzo's First Amendment rights, however, these violations could
not be imputed to the City because they did not occur pursuant to
municipal policy. "Municipalities are answerable only for their
own decisions and policies; they are not vicariously liable for the
constitutional torts of their agents." *Auriemma v. Rice*, 957 F.2d
397, 399 (7th Cir. 1992). In order for Randazzo to succeed on his
claims against the City, he must therefore show that any alleged
deprivation of rights was the result of a municipal policy. *Baskin
v. City of Des Plaines,* 138 F.3d 701, 704 (7th Cir. 1998).

> The case law recognizes three ways in which a
> municipality can be said to have violated an individual's
> constitutional rights: '(1) an express policy that, when
> enforced, causes a constitutional deprivation; (2) a
> widespread practice that, although not authorized by
> written law or express municipal policy, is so permanent
> and well settled as to constitute a custom or usage with
> the force of law; (3) an allegation that the
> constitutional injury was caused by a person with final
> policymaking authority.'

*Id.* at 704-05 (quoting *Baxter by Baxter v. Vigo Count Sch. Corp.*,
26 F.3d 728, 735 (7th Cir. 1994)).

The Chicago City Council is the official policymaker for
employment policies and has adopted an express policy forbidding
retaliation for an employee's exercise of political speech or
political affiliations. *See* Chicago Municipal Code § 2-74-090(A);

20

Auriemma, 957 F.2d at 399; Limes-Miller v. Chicago, 773 F. Supp. 1130, 1137 (N.D. Ill. 1991) ("Here official City policy is that all employees shall have the right 'to express [their] opinions on all political subjects.'") (quoting Chicago Municipal Code § 2-74-090(A)). Thus, it is evident that the City does not have an express policy of retaliation upon which to base municipal liability.

Randazzo argues that the alleged deprivations were the acts of municipal policymakers. As discussed above, the relevant policymaker for the City's employment practices based upon political considerations is the Chicago City Council. Auriemma, 357 F.2d at 399-401; Limes-Miller, 773 F. Supp. at 1136. Thus, absent evidence that the City Council delegated this policymaking authority (of which there is none), the alleged acts of Superintendent Levar, Assistant Commissioner Hennessy, or the other DSS supervisors implicated in Randazzo's complaint were not the acts of municipal policymakers. If, in fact, the actions of these individuals violated Randazzo's First Amendment rights, these actions constituted violations of the City's municipal policy. Auriemma, 357 F.2d at 401. Furthermore, there is no evidence in the record from which I could conclude that the City Council was aware of and ratified any of the decisions of these individuals. Baskin, 138 F.3d at 705 (describing ratification theory or municipal liability).

Randazzo has also failed to demonstrate that the there was a widespread practice or custom of retaliating against whistleblowers or those who associated with whistleblowers. *Latuszkin v. City of Chicago*, 250 F.3d 502, 505 (7th Cir. 2001) (stating that to show a widespread practice or custom, a plaintiff must show "activity . . . so persistent and widespread that City policymakers should have known about the behavior"). Outside of the actions taken against himself personally, Randazzo only identifies a single other individual, Roy Garza ("Garza"), whom he argues was retaliated against for his speech (or was deterred from freely speaking out) during the relevant time period.[23] These isolated instances are not enough to demonstrate that the City tolerated a widespread practice. *See e.g., Limes-Miller,* 773 F. Supp. at 1136. For the above reasons, based upon the admissible record in this case, a reasonable fact-finder could not conclude the City had a policy of retaliating against employees for their speech or associations.

In the alternative to his theory of retaliation, Randazzo also argues that the adverse actions taken against him were motivated by his lack of political "clout" (i.e. political connections) and that others who had "clout" received preferential treatment. Randazzo provides no evidence of a causal link between his lack of "clout"

---

[23]Garza, who was also involved in the CCA newsletter-fax incident on August 6, 2002, also received a 29-day suspension from Hennessy. Hennessy's stated reasons for the suspension were that Garza was promoting his own union candidacy and had slandered DSS supervisors in the CCA newsletter.

and the adverse action taken against him. Instead, he relies on speculation and conclusory reasoning that because adverse action was taken against him, that action must have been motivated by his lack of "clout." This result-based reasoning is insufficient to defeat a motion for summary judgment. *See Trnka,* 30 F.3d at 63 ("To stave off summary judgment in a case where innocent or multiple explanations for a defendant's actions abound a plaintiff must rely on more than *post hoc, propter hoc* reasoning."). The City provided legitimate reasons for the discipline he received from numerous different supervisors and, as discussed above, Randazzo has failed to show that the stated reasons were pretext. Finally, I note that even if Randazzo had established that the adverse action taken against him was the result of his lack of "clout," for reasons previously discussed, the admissible record fails to demonstrate that these actions were the result of municipal policy.

For the above stated reasons, I grant the City's motion for summary judgment on Randazzo's First Amendment retaliation claims.

V.

The City argues that Randazzo has abandoned his claim to invalidate the City's personnel rule by failing to address it in his response.[24] Having reviewed the record, it is clear that

---

[24]Randazzo's memorandum of law does not just simply overlook this claim, but includes a separate heading for the claim which is followed by a large blank space. Thus, it is evident that Randazzo was aware of the fact that the City had moved for summary judgment on this claim and he chose not to respond.

23

Randazzo presents no facts or argument in support of his claim to invalidate the City's personnel rule. He has abandoned this claim. *See e.g., Scott-Riley v. Mullins Food Prods.*, 391 F. Supp. 2d 707, 718 (N.D. Ill. 2005); *Sims v. Hastings*, 375 F. Supp. 2d 715, 718 (N.D. Ill. 2005) ("Precedent also teaches, however, that a court, of course, should not abandon its neutral role and begin creating arguments for a party, even an unrepresented one.") (citing *Anderson v. Hardman*, 241 F.3d 544, 545 (7th Cir. 2001)). The same is true of Randazzo's equal protection claim. Accordingly, I grant the City's motion for summary judgment on this claim.

VI.

For the above-stated reasons, the City's motion for summary judgment is granted on all claims.

**ENTER ORDER:**

*Elaine E. Bucklo*

**Elaine E. Bucklo**
United States District Judge

Dated: September 13, 2006

24